In re TELLURIDE GLOBAL
DEVELOPMENT, LLC,
Debtor.

Telluride Global Development,
LLC, Plaintiff,

Telluride Asset Resolution,
LLC, Intervenor,

v.

Dennis Bullock, et al., Defendants.

Bankruptcy No. 06–12720 MER.
Adversary No. 06–1588 MER.

United States Bankruptcy Court,
D. Colorado.

March 23, 2007.

Harold G. Morris, Jr., John C. Smiley, Theodore J. Hartl, Denver, CO, Steven R. Fox, Encino, CA, for Debtor.

## ORDER

MICHAEL E. ROMERO, Bankruptcy Judge.

THIS MATTER comes before the Court on the Plaintiff's Complaint, the Intervenor's Complaint (collectively the "Complaints") and the Limited Moving Partners' Answers thereto. The Court has reviewed the pleadings, the testimony, the written closing arguments of counsel and the legal authority cited by the parties and makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b)(1). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).

## PROCEDURAL BACKGROUND

On May 15, 2006, Telluride Global Development, LLC (the "Debtor" or "TGD"), filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Three days later on May 18, 2006, the Debtor filed the present Adversary Proceeding against the individual limited partners of Telluride Income Growth Limited Partnership ("TIGLP"). A group of these limited partners (the "Moving Limited Partners") filed a motion to dismiss the Complaint, and after the motion's subsequent denial, filed an Answer on September 13, 2006. On October 3, 2006, Telluride Asset Resolution, LLC ("TAR") filed a motion to intervene in this Adversary Proceeding, which was granted on October 24, 2006.

TIGLP is also a bankruptcy debtor by virtue of a Chapter 7 involuntary petition filed in this district, in which an Order for Relief entered on June 4, 2004.[1] As part of the TIGLP bankruptcy, the Honorable A. Bruce Campbell, entered three orders which are the subject of two recently issues decisions in the United States Bankruptcy Appellate Panel of the Tenth Circuit (the "B.A.P.")

## FACTUAL BACKGROUND

The facts and circumstances leading up to the Debtor's bankruptcy filing and this Adversary Proceeding are complex. In their Pretrial Statement the parties stipulated to the facts set forth below.[2]

1. January 1991—TIGLP was formed as an Arizona limited partnership by Steve Sogard and his brother, Scott Sogard. The original general partners of TIGLP were Telluride Development Group, Inc. (an entity controlled by Scott Sogard) and Scott Sogard individually.

2. TIGLP's primary business purpose was to purchase and develop real estate in Telluride, Colorado.

3. Steve Sogard, along with others working with him, organized and raised approximately $1,600,000 from various investors. The investors became limited partners in TIGLP.

4. Defendants are the limited partners in TIGLP. The Moving Limited Partners are 36 of the limited partners in TIGLP.

5. TIGLP purchased real estate in Telluride, Colorado, which later became known as the "Ballard House."

6. TIGLP, through its original general partners, commenced development

---

1. *See Telluride Income Growth Limited Partnership,* Bankruptcy Case No. 03–31600 ABC.

2. The Stipulated and Uncontested Facts are set forth as provided in the parties' Pretrial Statement with minor stylistic changes for readability.

of the Ballard House as a mixed-use residential condominium and commercial/retail project. Consisting of a North and a South unit, the intent was to develop and sell the North building first.

7. January 22, 1994—Scott Sogard was embroiled in a dispute with various TIGLP limited partners and his brother, Steve Sogard, over the operation of TIGLP.

8. Although an organizer of the TIGLP limited partners, Steve Sogard has never been a TIGLP limited or general partner.

9. June 1994—Scott Sogard and Telluride Development Group, Inc. resigned as general partners of TIGLP.

10. September 1994—Peak Returns Limited Liability Company, a Colorado LLC, ("Peak Returns") was appointed as the replacement general partner of TIGLP. Peak Returns began the development process anew. It determined that the South building should be developed and sold first.

11. Lorraine Development, an affiliate of William H. Baird ("Baird"), was retained by TIGLP as development manager for the project. Baird was a member of the Peak Returns board until 1998.

12. In April 1997, TIGLP obtained a $4,900,000 construction loan from Pueblo Bank & Trust Company ("Pueblo Bank").

13. Peak Returns was suspended on June 1, 1997, by the Colorado Secretary of State for failure to file its 1996 periodic report.

14. Construction of the South building began in early 1997 and was completed, but not timely. The South building unit sales commenced in February 1999.

15. November 10, 1997—Robert and Arthur Levine (collectively referred to as "the Levines") first became involved with TIGLP by paying $363,192.50 in deposits for condominium units 208N, 209N, 305N, and 306N.

16. The original Peak Returns Board of Managers consisted of Bruce Bjork, Hamish Cruden, Baird and Mike Galvin. In October 1998, Baird and Mike Galvin resigned from the Board of Managers of Peak Returns. Bruce Bjork, Ed Tompkins, Hamish Cruden, James Sterling, and Michael Milburn then constituted the Board of Managers of Peak Returns.

17. November 16, 1998—The Levines, or an entity they control, paid $160,000 to TIGLP for 4 parking spaces in the North building, a building which had not yet been built.

18. January 1999—TIGLP retained the services of David Patir to review partnership documents, contracts and transactions and prepare a report to the Board of Managers of Peak Returns.

19. April 29, 1999—David Patir issued a preliminary report on the Ballard House project stating, among other things, that TIGLP had a negative cash flow position.

20. In 1999, discussions were held by Baird and his entities on the one hand, and Peak Returns and its members on the other. The discussions concerned Baird's position that (1) he was without funds to continue to support the construction, (2) Pueblo Bank was threatening foreclosure, and (3) if title was

vested in one of his entities, he could better deal with Pueblo Bank.

21. June 15, 1999—Pueblo Bank commenced a foreclosure proceeding against Ballard House to foreclose its lien securing a loan to TIGLP that was in default.

22. Hamish Cruden, Ed Tompkins and Bruce Bjork favored transferring title to the Ballard House to Baird's entity Western Slope, LLC ("Western Slope"). James Sterling opposed the transfer and insisted that if the Ballard House were transferred the limited partners be given a priority re-payment status of their investment of approximately $1.6 million plus interest.

23. Baird refused James Sterling's demand.

24. June 22, 1999, August 10, 1999, September 2, 1999–The Levines, or an entity they control, paid $500,000 to TIGLP as a loan to help with construction costs.

25. June 23, 1999—Ed Tompkins, Michael Milburn, James Sterling, Hamish Cruden, and Bruce Bjork, then the Board of Managers of Peak Returns, signed a resolution regarding the pending foreclosure and the contemplated transfer of Ballard House to Baird or his designated entity. Baird's designated entity was Western Slope, which he controlled.

26. June 30, 1999—TIGLP, William H. Baird, and Lorraine H. Baird, on the one hand, and Pueblo Bank, on the other hand, entered into the first of five Forbearance Agreements to extend the foreclosure sale on the Ballard House project.

27. July 2, 1999—The Levines, or an entity they control, paid $426,034.56 for condominium unit 302S and one parking space in the Ballard House South building.

28. July 15, 1999—James Sterling received the first draft of what would become known as the Contract of Sale and Equity Participation Agreement (the "EPA") from S. Kent Karber, Esq., an attorney at Hall & Evans, LLC, a law firm in Denver.

29. July 18, 1999—Baird sent James Sterling a facsimile containing a revised proforma for development of the Ballard House project that projected no distribution to TIGLP under the EPA being negotiated unless a number of things "go well." Even if all things went "well," the projection set the maximum distribution to TIGLP at $1,552,674. This projection was incorporated into the final EPA.

30. James Sterling sent two letters to the limited partners, dated August 2, 1999, and August 19, 1999.

31. There were multiple drafts of the EPA prepared over a period of time of couple of months.

32. The members of Peak Returns reviewed the multiple drafts of the EPA on behalf of TIGLP and discussed the drafts amongst each other.

33. The Peak Returns board voted on July 31, 1999, to transfer the Ballard House from TIGLP to Western Slope. James Sterling was the only board member to vote against the EPA.

34. After the Peak Returns board voted to transfer the Ballard House from TIGLP to Western Slope, James Sterling resigned from the Peak Returns board.

35. October 7, 1999—Michael Milburn sent an e-mail to Ed Tompkins, another member of the Board of Managers of Peak Returns, concerning his vote on the transfer of the Ballard House to Baird and now purporting to abstain.

36. October 7, 1999—TIGLP and Western Slope, an entity controlled by Baird, entered into the EPA.

37. October 11, 1999—Western Slope signed a Purchase Money Deed of Trust (the "PMDOT") securing its obligations to TIGLP under the EPA. The PMDOT was then recorded in San Miguel County, along with a warranty deed reflecting the transfer of title from TIGLP to Western Slope.

38. November 15, 1999—Baird sent an e-mail to Michael Milburn and other members of the Peak Returns board expressing concerns about the profitability of the Ballard House project.

39. December 22, 1999—The Levines, or an entity they control, paid $660,628.47 to Western Slope for condominium unit 205S.

40. December 22, 1999—The Levines, or an entity they control, paid $428,440.85 to Western Slope for condominium unit 301S.

41. May 12, 2000—The Levines, or an entity they control, paid $155,000 to Western Slope for a loan to help with construction costs.

42. June 1, 2000—Peak Returns was administratively dissolved by the Colorado Secretary of State.

43. July 10, 2001—Michael Milburn resigned from the Board of Managers of Peak Returns.

44. February 8, 2002—The Levines, or an entity they control, paid $111,000 to Western Slope for a loan to help with construction costs.

45. February 19, 2002—The Levines, or an entity they control, paid $1,010,714.44 to Pueblo Bank to purchase its loan to TIGLP.

46. September 27, 2002—E–Global Development Limited ("E–Global") acquired title to the Ballard House property from Western Slope through a deed in lieu of foreclosure transfer.

47. September 27, 2002—E–Global transferred title to the Ballard House project to the Debtor. [3] The Debtor has held title since that date.

48. September 27, 2002—Peak Returns, ostensibly on behalf of TIGLP, purported to subordinate TIGLP's rights under the PMDOT to a lien in favor of WestStar Bank. WestStar's deed of trust and the subordination agreement were recorded in San Miguel County.

49. Peak Returns entered into a "Partial Release of Deed of Trust" purportedly on TIGLP's behalf, in favor of Western Slope on May 1, 2002.

50. No successor general partner to Peak Returns was ever elected.

51. October 11, 2002—Many, but not all, of the TIGLP limited partners commenced litigation against TIGLP and others, asserting claims for (1) breach of fiduciary duty, (2)

**3.** The evidence presented at trial indicates the Debtor is solely owned by E–Global, which in turn is owned by the Levines.

accounting, audit and dissolution, (3) breach of contract, (4) misappropriation/fraudulent transfer of partnership funds, (5) self-dealing, and (6) foreclosure of interest (the "State Court Action").

52. October 2002 to October 2003—The Levines, or an entity they control, paid $185,441.66 in architectural fees for the development of the Ballard House property.

53. TGD was added as a defendant in the State Court Action soon after it was commenced in October 2002.

54. TGD, along with other related parties, filed a motion, under C.R.Civ.P. 12(b)(5), to dismiss the foreclosure claim asserted in the State Court Action. The State Court denied this motion in a written opinion.

55. January 31, 2003—The State Court entered Findings of Fact, Conclusions of Law, and Order Granting Preliminary Injunction in the State Court Action after a 3-day preliminary evidentiary hearing.

56. February 24, 2003—The Plaintiffs in the State Court Action filed a First Amended Complaint adding a new claim for foreclosure of an equitable lien.

57. The Moving Limited Partners recorded their "Notice of Posting Bond and Notice of Action" with the Clerk–Recorder, County of San Miguel, on September 16, 2003.

58. An entity known as Peak Returns Limited Liability Company ("Peak Returns II"), signed Articles of Organization on March 3, 2003, which were filed with the Colorado Secretary of State on March 4, 2003. The Articles of Organization state the entity was "designated as the Successor in Interest for all intents and purposes for that certain dissolved and suspended Colorado limited liability company known as Peak Returns Limited Liability Company ... organized on 12/7/94, and administratively dissolved by the Colorado Secretary of State on 1/1/2001 (sic)."

59. Peak Returns II caused a bankruptcy petition to be filed on TIGLP's behalf on March 5, 2003, case number 03–13632 ABC (the "Voluntary Case"), one day after Peak Returns II filed its Articles of Organization with the Secretary of State.

60. In the context of the Moving Limited Partners' motion to dismiss the Voluntary Case, the Moving Limited Partners, having learned that Peak Returns had been administratively dissolved and Peak Returns II had been formed just prior to the bankruptcy filing, supplemented their motion to dismiss contending the bankruptcy petition had been filed by an entity that lacked authority. The bankruptcy court dismissed the Voluntary Case.

61. October 29, 2003—An involuntary petition was filed against TIGLP in the United States Bankruptcy Court for the District of Colorado. TGD was one of the petitioning creditors.

62. June 4, 2004—The involuntary petition against TIGLP was granted.

63. July 8, 2004—The Bankruptcy Court in the TIGLP case entered an Order Denying Motion to Reconsider Order Granting Involuntary Petition.

64. Jeanne Jagow, acting as the Chapter 7 Trustee (the "Trustee"), removed the State Court Action to

the involuntary case, as Adversary Case No. 04–1830 ABC.

65. October 6, 2004—The Moving Limited Partners filed an objection to the TIGLP Chapter 11(sic) Trustee's motion to sell all the estate's assets to TAR.

66. March 22, 2005—The Trustee filed a [second] motion to sell all the assets of the TIGLP bankruptcy estate, including all the estate's rights under the EPA, to TAR, an entity controlled by Robert and Arthur Levine.

67. August, 2005—The motion to sell the TIGLP bankruptcy estate's assets to TAR was approved (the "Sale Order").

68. August 11, 2005—The Moving Limited Partners filed a motion to have the Bankruptcy Court amend the Sale Order approving the sale to TAR.

69. September 7, 2005—The bankruptcy court denied the Moving Limited Partners' motion to amend. The Moving Limited Partners appealed this ruling to the B.A.P.

70. TAR and TGD filed a motion in Adversary Case No. 04–1830 ABC to dismiss the State Court Action, and the Moving Limited Partners filed a motion to remand the State Court Action to the State Court.

71. The Bankruptcy Court granted the motion to dismiss the State Court Action, except for the Moving Limited Partners' individual, non-derivative claims (if any). The Moving Limited Partners assert they hold claims and TGD and TAR dispute this assertion. The Bankruptcy Court also granted the motion to remand the State Court Action. TGD took an appeal to the B.A.P. of the order remanding the State Court Action.

72. The B.A.P. held oral arguments on or about August 25, 2006, in both the Moving Limited Partners' and TGD's appeals.

73. May 15, 2006—The Debtor filed its bankruptcy petition.

In addition to above Stipulated and Uncontested Facts, the B.A.P. published two opinions deciding both appeals during the time the parties were preparing their written closing statements and responses in this case.[4]

## REQUESTED RELIEF

The Complaints originally alleged seven claims for relief. However, at trial the Plaintiff and the Intervenor indicated they would only proceed on four of their seven claims, including: 1) the Determination of Nature, Validity and Priority of the Al-

---

4. Pursuant to FED.R.EVID. 201(a)-(c), this Court takes judicial notice of both B.A.P. opinions to the extent they impact the Court's decision in this case. *See Telluride Income Growth, L.P.,* 364 B.R. 407, 414–15 (10th Cir. BAP 2007) ("[T]he doctrine of judicial notice is broadly construed in the Tenth Circuit. The scope and reach of the doctrine of judicial notice has been enlarged over the years until today it includes those matters that are verifiable with certainty.'") (*citing St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.,* 605 F.2d 1169, 1172 (10th Cir.1979)) ("it has been held that federal courts, in ap-

propriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (*citing Chandler v. O'Bryan,* 311 F.Supp. 1121 (D.Okla.1969); *United States ex rel. Geisler v. Walters,* 510 F.2d 887 (3rd Cir. 1975); *Barrett v. Baylor,* 457 F.2d 119 (7th Cir.1972); *Rhodes v. Houston,* 309 F.2d 959 (8th Cir.1962), *cert. denied,* 372 U.S. 909, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963); *St. Paul Fire & Marine Insurance Company v. Cunningham,* 257 F.2d 731 (9th Cir.1958)).

leged Equitable Lien; 2) Disallowance of the Limited Partners' Claims Pursuant to 11 U.S.C. § 502; 3) Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b);[5] and 4) Dissolution of Injunction.[6] The parties' Pretrial Statement focuses the scope of the requested relief and presents the following questions to this Court.

1) Whether the TIGLP limited partners are third-party beneficiaries under the EPA or PMDOT?

2) Whether the TIGLP limited partners have a right to an equitable lien on property of the estate?

3) Whether the TIGLP limited partners' equitable lien, if any, is avoidable as a fraudulent conveyance under 11 U.S.C. § 544(b) of the Colorado Uniform Fraudulent Transfer Act?

4) Whether TAR acquired all interests and rights to receive payment under the EPA when it purchased TIGLP's rights thereunder?

## DISCUSSION

### A. Whether this Court Should Resolve the Pending Issues

Before discussing the specific issues raised above, the Court must first address the Moving Limited Partners' assertion this Court should not resolve the issues presented in this Adversary Proceeding because they are the same issues and facts pending before Judge Campbell in the removed State Court Action. In support of this argument, the Moving Limited Partners refer the Court to Colorado's "rule of exclusive jurisdiction" and its federal counterpart, the "prior pending action doctrine."[7]

■■■ "The exercise of concurrent jurisdiction is controlled by the principle of priority, which is sometimes referred to as the rule of exclusive concurrent jurisdiction." *Estates in Eagle Ridge, LLLP v. Valley Bank & Trust (Eagle Ridge)*, 141 P.3d 838, 844 (Colo.App.2005) *(citing Utils. Bd. v. Southeast Colo. Power Ass'n*, 171 Colo. 456, 468 P.2d 36 (1970); *Martin v. Dist. Court*, 150 Colo. 577, 375 P.2d 105, 106 (1962)). This rule is based on the public policy of preventing contrary decision in two courts which share concurrent jurisdiction and avoiding duplicative or multiple lawsuits. *Eagle Ridge*, 141 P.3d at 844.

The Court has reviewed the legal authority cited by the Moving Limited Partners and has conducted its own legal research in an attempt to find a federal case applying Colorado's "rule of exclusive concurrent jurisdiction." The Court has found none. Thus, the Court finds the Moving Limited Partners' argument is better addressed under the analogous fed-

---

**5.** Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

**6.** Initially, the Plaintiff and the Intervenor also asserted these claims for relief: Estimation of the Limited Partners' claims at $0.00; Avoidance Pursuant to 11 U.S.C. § 544(a); and Damages for Slander of Title.

**7.** Initially, the Court notes the rules cited by the Moving Limited Partners may have limited applicability in the bankruptcy context. The cases cited by the Moving Limited Partners in support of the application of these doctrines generally involve two separate lawsuits filed in two state courts or a state and federal court. The introduction of a bankruptcy case changes this dynamic. A bankruptcy case is not a single lawsuit, rather it is part of a process for the liquidation, reorganization or rehabilitation of financially distressed individuals and entities. As part of this process, claims of all types asserted against a debtor must be determined. As part of these "claims" hearings, a bankruptcy court regularly adjudicates matters which have been asserted in lawsuits in other courts.

eral doctrine referred to as the "prior pending action doctrine."

■■■ "The prior pending action doctrine is one of federal judicial efficiency and provides that '[w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second.'" *Cupe v. Lantz*, 470 F.Supp.2d 128, 132 (D.Conn.2007) *(citing Motion Picture Lab. Technicians Local 780 v. McGregor & Werner, Inc.*, 804 F.2d 16, 19 (2nd Cir.1986)); *see also In re Canter (Canter)*, 1 B.R. 172, 175 (Bankr.D.Mass.1979). The decision to not hear the subsequent action is discretionary. *See Adam v. Jacobs*, 950 F.2d 89, 92 (2nd Cir.1991). Generally, a Court may decline to hear a subsequent lawsuit when (1) "an identity of issues exists [with the prior pending action]," and (2) "the controlling issues in the dismissed action [the subsequent action] will be determined in the other lawsuit." 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1360, p. 89 (3d ed.2004); *see also Canter*, 1 B.R. at 175 (Bankr.D.Mass.1979). In determining whether a claim is barred by the prior pending action doctrine, this court may compare the pleadings filed in the two actions. *See Connecticut Fund for the Environment v. Contract Plating Co.*, 631 F.Supp. 1291, 1293 (D.Conn.1986).

■■■ In this case, the Moving Limited Partners assert the Adversary Proceeding before Judge Campbell and the matter before this Court present identical issues. However, even assuming the Moving Lim-

ited Partners' claims before Judge Campbell and this Court are the same, on January 17, 2006, Judge Campbell ordered "all direct claims by the Moving Limited Partners, if any, and any counterclaims thereto, if any, are remanded to the Colorado State Court provided that claims against the Debtor [TIGLP], if any, shall be resolved in this Court." *See Moving Limited Partners' Exhibit 114.* Judge Campbell's order on remand to the State Court was affirmed by the B.A.P. *See Telluride Income Growth, L.P. ("Telluride 1")*, 364 B.R. 390, 400–01 (10th Cir. BAP 2007). Assuming the alleged same issues are now before the State Court, the general rule is that "as between state and federal courts … 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction….'" *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) *(citing McClellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501, 54 L.Ed. 762 (1910)). Thus, the Court finds the "pending prior action doctrine" is not applicable to the facts of this case.[8]

■■ Furthermore, to the extent the Moving Limited Partners assert this Court lacks jurisdiction over their claims, the Court finds many, if not all, of the Moving Limited Partners have filed proofs of claim in this case. *See Plaintiff's and Intervenor's Exhibit 63* (attached as Exhibits 11–47). Thus, the Moving Limited Partners have consented to this Court's jurisdiction. *See In re Miramar Resources, Inc.*, 176 B.R. 45, 48 n. 2 (Bankr.D.Colo.1994) ("a creditor consents to the equitable jurisdic-

---

**8.** Alternatively, even if the "prior pending action doctrine" is applicable to this case, the rule provides an exception for "special circumstances" which would justify giving priority to the second legal action. As previously noted, the introduction of a bankruptcy peti- tion changes the dynamic of the previously filed action. Under the circumstances of this case the Court finds the filing of a bankruptcy is a special circumstance which justifies giving priority to this action.

tion of the bankruptcy court when the creditor files ... a proof of claim ...; once the consent is given, the entire proceeding should be treated as a core proceeding.") *(citing Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.),* 95 B.R. 782, 788 (Bankr.D.Colo.1989)). Therefore, the Court will adjudicate the issues before it.

## B. The Moving Limited Partners' Third–Party Beneficiary Claim

The Moving Limited Partners assert they are third-party beneficiaries of the EPA and the PMDOT.[9] Conversely, TGD and TAR assert the language of both the EPA and PMDOT demonstrates the parties to those documents never intended the Moving Limited Partners to be third-party beneficiaries. Both parties initially argue the EPA and PMDOT are not ambiguous. However, in the event the Court differs with that assertion, the parties presented testimony at trial on the intent behind the drafting of these documents.

 In order to determine whether a contract is ambiguous, " 'the language used therein must be examined and construed in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter.' " *Cheyenne Mountain School Dist. No. 12 v. Thompson (Cheyenne Mountain),* 861 P.2d 711, 715 (Colo. 1993) *(quoting Christmas v. Cooley,* 158 Colo. 297, 406 P.2d 333, 335 (1965)). "A document is ambiguous 'when it is reasonably susceptible to more than one meaning.' " *Cheyenne Mountain,* 861 P.2d at 715 *(quoting Northern Ins. Co. of New York v. Ekstrom,* 784 P.2d 320, 323 (Colo. 1989)). Whether a contract is ambiguous

is a question of law. *See Smalley & Co. v. Emerson & Cuming, Inc.,* 808 F.Supp. 1503, 1514 (D.Colo.1992). "Although parole evidence may be considered by the court to determine if a contract is ambiguous, if after hearing the evidence the contract remains unambiguous the parole evidence should be stricken." *In re Parsons,* 272 B.R. 735, 753 (D.Colo.2001) *(citing Magnetic Copy Servs., Inc. v. Seismic Specialists, Inc.,* 805 P.2d 1161, 1164 (Colo. App.1990)).

 Generally, a person who is not a party to a specific contract and who has furnished no consideration cannot avail himself of the terms or rights provided under the contract. *See East Meadows Co., LLC v. Greeley Irr. Co. (East Meadows),* 66 P.3d 214, 217 (Colo.App.2003) *(citing Academy of Charter Schools v. Adams County School District No.,* 32 P.3d 456, 470 (Colo.2001); *Continental Casualty Co. v. Carver,* 91 Colo. 188, 14 P.2d 181, 183 (1932)). However, under Colorado law there is an exception to the general rule which provides, "[a] person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract." *E.B. Roberts Const. Co. v. Concrete Contractors, Inc. (Roberts S.Ct.),* 704 P.2d 859, 865 (Colo.1985); *aff'd* 104 Idaho 865, 664 P.2d 772 (1983); *see also R.N. Robinson & Son, Inc. v. Ground Improvement Techniques,* 31 F.Supp.2d 881, 887 (D.Colo.1998). The non-party seeking to derive a benefit from the contract is commonly referred to as the third-party beneficiary. In order to determine whether a non-party may assert a claim as a third-party beneficiary,

9. Although the Moving Limited Partners assert they are third-party beneficiaries under both the EPA and the PMDOT, their argument primarily relies on the EPA.

[t]he key question is the intent of the parties to the actual contract to confer a benefit on a third party. That intent must appear from the contract itself or be shown by necessary implication. It is a question of fact to be determined by the terms of the contract taken as a whole, construed in the light of the circumstances under which it was made and the apparent purpose the parties were trying to accomplish.

*East Meadows,* 66 P.3d at 217; (*citing Concrete Contractors, Inc. v. E.B. Roberts Const. Co.,* 664 P.2d at 725 (Colo.App. 1982), *aff'd,* 704 P.2d 859 (Colo.1985)).

■ Because the intent of the parties must arise from the contract itself, it is instructive to set out those portions of the EPA upon which the Moving Limited Partners rely to support their third-party claim.

2.01(a) As consideration for the sale of the Premises [Ballard House], Purchaser [Western Slope] shall: (i) sign, execute, and deliver a Purchase Money Deed of Trust [PMDOT] granting the Seller [TIGLP] the right to 80% of the net profits (as defined in Schedule C) realized if the build-out and the sale of the condominium units of the Ballard House Project occurs; and (ii) assume all expenses, liability and responsibility for the completion of the construction of the Ballard House Project and the sale and marketing of the condominium unit interests of the Ballard House Project. These obligations of the Purchaser [Western Slope] in exchange for the Premises [Ballard House] stated herein and in the Deed of Trust shall hereinafter be referred to as "Consideration." All monies, if any, advanced by the Purchaser for the above costs, shall be included and become a part of the Total Project Costs as set forth in Schedule C.

Schedule C—Net Profits and distribution as referred to in Section 2.01(a) shall be determined as follows: Net Profits are defined as total project revenues, 1) less repayment of all project expenses and existing future debts related to performing the obligations under this agreement, 2) *less repayment of the amount of the Telluride Income Growth Limited Partnership investors outstanding original investment in an amount not to exceed $1,600, 000 plus interest from the date of investment forward accrued at the rate of 8% per year.* Once the above two criteria have been met, in the order listed above, then the balance of Net Profits will be distributed with 80% to Seller [TIGLP] and 20% to Purchaser [Western Slope].

*See Plaintiff's and Intervenor's Exhibit 21 and the Moving Limited Partners' Exhibit 91,* pp. 2 and 3., ¶ 2.01(a) and *Schedule C,* p. 17, Schedule C–Exhibit "A"—Net Profits (emphasis added). Based on these provisions and specifically the language contained in Schedule C, the Moving Limited Partners assert third-party beneficiary status under the EPA.

The Court has reviewed the EPA and the PMDOT in their entirety and finds they are clear and unambiguous. Although the second clause of Schedule C refers to repayment of the TIGLP limited partners' investment, the Court finds it does not confer any direct payment rights to the Moving Limited Partners in this case. Contrary to the Moving Limited Partners' argument, the second clause of Schedule C merely provides a *priority* of payment rather than a *right* to payment and therefore does not confer on the Moving Limited Partners third-party beneficiary status. Specifically, the italicized language provides the order in which the obligations would be satisfied prior to determining the "Net Profits" payable to TIGLP and Western Slope in their respec-

tive percentages. This construction is consistent with section 2.01(h) of the EPA which states:

> Seller [TIGLP] and Purchaser [Western Slope] agree and acknowledge that Agreement shall provide to Seller [TIGLP] the benefit of participation in any equity existing in the property as of the time existing liens against the property referred to in Schedule B and any future liens and future monies due are satisfied. Purchaser's [Western Slope] existing and prospective fees in the project have been satisfied, and other expenses of the project, agreed to by Seller [TIGLP] have been paid, such that at the time such prior and existing payments have been made, Seller [TIGLP] shall be entitled to participate in any equity then remaining in the property as herein set forth.

Section 2.01(h) sets forth the parties' clear intent that the "Seller" (TIGLP), is the beneficiary of, and may participate in, any equity existing in the Ballard House. Significantly, section 2.01(h) does not provide for the limited partners to be participants in any equity remaining in the Ballard House. The fact the Moving Limited Partners did not sign the EPA, are not named parties to the EPA or the PMDOT, are not otherwise mentioned in the EPA (except as "investors" in Schedule C) and did not give any consideration for the EPA further demonstrates the Moving Limited Partners were not intended by TIGLP and Western Slope to be direct beneficiaries of the EPA.

Alternatively, even if the EPA and PMDOT were not clear and unambiguous (which they are), the introduction of parole evidence at trial makes clear the named parties to those agreements did not intend the Moving Limited Partners to be third-party beneficiaries of the EPA or PMDOT.

The Court heard testimony from Baird, the owner of Western Slope, one of the named parties to the EPA and the PMDOT. Baird testified there was no intent to benefit the Moving Limited Partners. He further testified the executing parties intended the $1.6 million plus interest to be paid to TIGLP and not directly to the individual limited partners. However, the Moving Limited Partners assert Baird's testimony is suspect and should not be believed because of his "financial incentive to lie." *Moving Limited Partners' Post Trial Brief,* p. 30. Instead, the Moving Limited Partners suggest the testimony of James Sterling ("Sterling") and Michael Milburn ("Milburn") demonstrate the limited partners were intended to be third-party beneficiaries to the EPA.

As correctly pointed out by the Plaintiff and Intervenor, the parties' stipulated facts indicate Sterling "opposed the transfer [of Ballard House to Western Slope] and insisted that if Ballard House were transferred that the limited partners be given a priority re-payment status of their investment of approximately $1.6 million plus interest." *Uncontested and Stipulated Facts,* No. 22. This demand was refused. *Id.* at No. 23. Thus, as of this time, there was no indication that the limited partners were to receive any "special" treatment under the EPA.

Sterling testified he thereafter resigned from the Peak Returns board, in part, because of the rejection of his demands. He further indicated he was involved in no further negotiations on the EPA after his resignation. The only other testimony presented by the Moving Limited Partners to establish the intent issue was that from Milburn. The sole thrust of Milburn's testimony was that he believed any equity would be paid directly to the limited partners. Unfortunately, this testimony merely stated his understanding of the EPA

and is not supported by any evidence presented at trial.

In addition to Baird's testimony, which this Court found to be credible, the Court has considered deposition testimony from Bruce Bjork ("Bjork") and Ed Tompkins ("Tompkins") both of whom were members of the board of directors of TIGLP's general partner Peak Returns and were involved in negotiating the terms of the EPA. Bjork testified that during negotiations of the EPA there were no discussions or suggestions that Western Slope would make any direct payments to the limited partners. *See Bjork Deposition Transcript*, pp. 14–16. Tompkins' testimony mirrored Bjork's testimony and further indicated that during the course of negotiations between TIGLP and Western Slope there were no discussions to pay the limited partners directly under the EPA. *See Tompkins' Deposition Transcript*, pp. 14–15.

In response to both the testimony of Bjork and Tompkins, the Moving Limited Partners argue that because Bjork and Tompkins did not testify in person at the trial, the Court could not weigh their credibility and thus their testimony should be ignored. While the Moving Limited Partners are correct this Court could not assess Bjork's and Tompkins' demeanor, the Court notes the Moving Limited Partners stipulated to the admission of both individuals' testimony at the trial. The Court finds the testimony of Bjork and Tompkins at the least is corroborative of Baird's testimony that the parties to the EPA did not intend to directly benefit the individual limited partners.

Therefore, even if the Court were to find the terms of the EPA and PMDOT to be ambiguous and were to allow parole evidence regarding the parties' intent under the EPA, the testimony elicited at trial supports the assertion by the Plaintiff and the Intervenor that the Moving Limited Partners were never intended to be third-party beneficiaries to the EPA.

Because the Court has determined the Moving Limited Partners are not third-party beneficiaries of the EPA and PMDOT, the Court does not need to address TGD's and TAR's alternative argument that even if the Moving Limited Partners were intended to be third-party beneficiaries, no money was available to them after paying project expenses.

## C. The Moving Limited Partners' Equitable Lien Claim

In addition to their third-party beneficiary claim, the Moving Limited Partners assert they hold an equitable lien on the Ballard House property.[10] The Moving Limited Partners' argument is two-fold. First, the Moving Limited Partners assert the Court should find an equitable lien in their favor for the same reasons stated by the State Court in its Order Denying the Telluride Global Defendants' Motion to Dismiss Plaintiffs' Foreclosure Claim (the "Motion to Dismiss Order"). *See Moving Limited Partners' Exhibit 108 and Post*

---

**10.** The parties' written closing arguments and the responses thereto do not address whether the Moving Limited Partners can successfully assert an equitable lien claim if the Court determines they are not third-party beneficiaries to the EPA. The Moving Limited Partners' First Amended Complaint filed in the State Court Action asserts a cause of action for Foreclosure of Equitable Lien not referring to the basis or legal theory behind the formation of such lien. *See Moving Limited Partners' Exhibit 107*, pp. 28–32. Also, the parties' Pretrial Statement and written closing statements address the Moving Limited Partners' equitable lien claim apart from their third-party claim. Thus, the Court will also analyze the Moving Limited Partners' equitable lien claim separately from their third-party beneficiary claim.

*Trial Brief,* pp. 26–27. Second, although the Moving Limited Partners do not address this argument in their Post Trial Brief, at trial they spent considerable time attempting to demonstrate the existence of a conspiracy involving the Levines and members of the Peak Returns Board of Managers, including that Hamish Cruden ("Cruden") and Baird, who allegedly sought to deprive the Moving Limited Partners of their investment in the Ballard House. Based on this alleged conspiracy, the Moving Limited Partners argue this Court should impose an equitable lien on the Ballard House. The Court will address both of these arguments.

 "An equitable lien is a creature of equity, is based on the equitable doctrine of unjust enrichment, and is the right to have a fund or specific property applied to the payment of a particular debt. Such a lien may be declared by a court of equity out of general considerations of right and justice as applied to the relationship of the parties." *Leyden v. Citicorp Indus. Bank (Leyden),* 782 P.2d 6, 9 (Colo.1989) *(citing Caldwell v. Armstrong (Caldwell),* 342 F.2d 485, 490 (10th Cir.1965)). The primary purpose of imposing an equitable lien is the same as that of imposing a constructive trust—to prevent unjust enrichment. *Leyden,* 782 P.2d at 10 and 11.

 Under Colorado law, an equitable lien may be created either "by a written contract showing an intention to charge property with a debt or obligation, or by a court of equity, out of general considerations of right and justice, as applied to the relations of the parties and the circumstances of their dealings." *Valley State Bank v. Dean,* 97 Colo. 151, 47 P.2d 924, 927 (1935) (citations omitted).[11] To

impose an equitable lien, two requirements must be satisfied. First, there must exist "a debt, duty, or obligation owing from one person to another," and second, there must be "a *res* to which the obligation would be fastened...." *Leyden,* 782 P.2d at 11. "Equitable relief is available only when the law affords none." *In re Marriage of Hall,* 971 P.2d 677, 679 (Colo.App.1998) *(citing In re Estate of Kubby,* 929 P.2d 55 (Colo.App.1996)).

 Regarding their first argument, the Moving Limited Partners cite to the State Court's Motion to Dismiss Order and argue this Court "should find that the LPs hold an equitable lien for the same reasons stated by the state court...." *Moving Limited Partners' Post Trial Brief,* p. 27. The pertinent language of the State Court's Motion to Dismiss Order as reproduced by the Moving Limited Partners states:

> The EPA can be, *and should be,* construed as conferring on the LPs, as third party beneficiaries to receive the return of their investments with interest. Given the non-recourse nature of the EPA and the PMDOT as well, the EPA, on its own, indicates the intention by the parties to the EPA that the LPs' investment be satisfied from the Ballard House. [MLP's Exhibit 108 at pages 2–3].

*Moving Limited Partners' Post Trial Brief,* p. 27 (emphasis added).

However, the above-quoted passage is simply not accurate and appears to be a glaring misrepresentation of the language contained in the State Court's Motion to Dismiss Order. In relevant part, the State Court's Motion to Dismiss Order actually

11. In this case, because the Court has determined the EPA and the PMDOT do not evidence any intent to provide directly for the limited partners, the Moving Limited Partners' request for an equitable lien must be based on the "general considerations of right and justice."

states, "[i]n this case, the agreement [EPA] *could be construed* as conferring a right on the limited partners as third-party beneficiaries to receive the return of their investment with interest as a cost of the project." *See Moving Limited Partners' Exhibit 108* (emphasis added by this Court).

Putting aside the fact the Moving Limited Partner have failed to reproduce the quotation from the State Court's Motion to Dismiss Order exactly, they have included the additional language *"and should be"* which simply does not appear in the State Court's Motion to Dismiss Order. The difference between the language cited in the Moving Limited Partners' Post Trial Brief and what actually appears in the Motion to Dismiss Order is substantial and significantly alters the meaning of the State Court's ruling. It is unclear whether the Moving Limited Partners intended the cited language to be legal argument that was incorrectly indented in a quotation, or actually intended to mislead the Court. In either instance, the passage leaves the impression the State Court made a finding that the EPA conferred third-party beneficiary status on the Moving Limited Partners. This is simply not the case.

In its order, the State Court was determining a motion to dismiss under C.R.C.P. 12(b)(5), and in this respect determined the Moving Limited Partners' Amended Complaint was sufficient to state a possible claim for the establishment and foreclosure of an equitable lien. *See Moving Limited Partners' Exhibit 108*, pp. 2–3 and *Exhibit 89*, p. 4 (stating, "[i]n this courts' Order Denying the Telluride Global Defendants' Motion to Dismiss Plaintiffs' Foreclosure Claim, this court recognized plaintiffs' [sic] stated a cause of action to foreclose an equitable lien on the property."). By its very nature, the Motion to Dismiss Order is a preliminary finding and does not constitute a ruling on the merits of the Moving Limited Partners' equitable lien claim. Because the State Court's findings are preliminary in nature, they are not generally binding on this Court. *See In re Dews*, 152 B.R. 982, 985 (D.Colo. 1993) ("[g]enerally, preliminary injunction determinations are not accorded preclusive effect.") *(citing Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 754–55 (S.D.N.Y.1990)). The Moving Limited Partners have set forth no circumstances or facts to support deviation from this general rule. Therefore, the Court finds the Motion to Dismiss Order is not binding on this Court and thus cannot in of itself provide a basis for this Court to impose an equitable lien on the Ballard House property.

Regarding the Moving Limited Partners' second argument for the creation of an equitable lien, there was little, if any, evidence presented during the four days of trial in this matter to establish the Levines (or a Levine-owned and controlled entity) owed a debt, duty or obligation to the Moving Limited Partners. *See Leyden*, 782 P.2d at 11. The Moving Limited Partners spent several hours at trial attempting to convince this Court of the existence of a conspiracy between the Levines or entities owned by the Levines and other Peak Returns board members including Cruden and Baird. The Moving Limited Partners' conspiracy theory is based on the following arguments: 1) the Levines were allowed to purchase condominium 302S for the "discounted" price of $426,034; 2) the Levines condominium units were upgraded with higher quality finishes than those of other buyers; and 3) the Levines participated in the mismanagement of TIGLP.

Concerning their first conspiracy argument, the Moving Limited Partners assert

that in July of 1999, the Levines purchased condominium 302S for the "discounted" price of $426,034 rather than for its fair market value of approximately $800,000. They further assert the Levines were offered the lower price due to a $500,000 loan the Levines had given the Debtor at approximately the same time. At trial Robert Levine ("Levine") testified he believed condominium 302S to be worth the amount the Levines had paid. However, in previous testimony before the State Court, Levine testified he believed condominium 302S to be worth approximately $800,000. The Moving Limited Partners assert the "discounted" purchase price, as well as Levine's contradictory testimony is evidence of the Levines being involved in a conspiracy.

Although Levine had previously testified condominium 302S was worth $800,000, he indicated his prior testimony was based on the assumption that the Levines could re-sell this condominium as part of a fractional time-share program. However, because Pueblo Bank ultimately refused to allow a fractionalized time-share program with regard to the Ballard House, Levine testified the $800,000 figure was inaccurate. The Court finds Levine's explanation to be credible.

In addition, TIGLP and Pueblo Bank entered into a Forbearance Agreement on June 30, 1999, in which Pueblo Bank required TIGLP to sell Unit 302S for at least $340,178. *See Plaintiff's and Intervenor's Exhibit 11.* The purchase amount of $426,034 was in excess of what Pueblo Bank required and suggests the Levines were not given a "discount" on their condominium purchase.

Second, the Moving Limited Partners assert the Levines' condominiums were upgraded with marble, fireplaces, and terraces, and that the wood trim was switched from pine to cherry, all at no cost

to the Levines. Although the evidence indicates some condominiums were outfitted with higher quality finishes than others, the Moving Limited Partners presented no evidence indicating which specific units had been ungraded and whether the Levines' condominium units were part of the upgrade. Thus, there is no testimony directly or indirectly supporting this claim.

Third, the Moving Limited Partners contend the Levines, Baird and Cruden conspired to mismanage TIGLP to deprive the Moving Limited Partners of any equity. Specifically, the Moving Limited Partners argue the Levines, Baird and Cruden conspired to manufacture cost overruns and slow construction, that they failed to close deals on certain condominium sales, and that they fabricated a TIGLP financial crisis, all in order to allow the Peak Returns Board of Managers to transfer the Ballard House property to Western Slope. However, simply put, there is no evidence the Levines or any of the Levines' entities were involved in any of the construction decisions, the operations of TIGLP, Peak Returns or Western Slope, or in any aspect of the Ballard House construction project other than through the purchase of several condominiums and parking spaces. There is no evidence the Levines conspired with *anybody* to mismanage or harm TIGLP or its investors. Therefore, the Court finds the Moving Limited Partners have not supported their final argument for imposing an equitable lien on the Ballard House.

Because the Court has determined the Moving Limited Partners are not entitled to an equitable lien on the Ballard House property, the Plaintiff's and Intervenor's fifth claim for relief, *i.e.,* fraudulent transfer pursuant to § 544(b) becomes moot because there is no equitable lien to avoid.

## D. Dissolution of the State Court Preliminary Injunction

■ The State Court issued its Findings of Fact, Conclusions of Law, and Order Granting Preliminary Injunction on January 31, 2003 (the "Preliminary Injunction Order"). The Preliminary Injunction Order provided, *inter alia,* the Defendants (including the Debtor) in the State Court action were "enjoined from selling, transferring, or encumbering the north building or parking units P1, 7, 8, 9, 12, and 13 in the south building...." *See Moving Limited Partners' Exhibit 89,* pp. 6–7. The Plaintiff and Intervenor seek to have this Court dissolve the State Court's Preliminary Injunction Order. In support of their request, the Plaintiff and Intervenor argue the preliminary injunction issued by the State Court is a "claim" as defined by § 101(5)(B) of the Bankruptcy Code and thus is dischargeable. Conversely, the Moving Limited Partners assert the Court should not dissolve the Preliminary Injunction Order because,

> [t]he state court action is currently before Judge Campbell who declined TGD's request that he release the preliminary injunction. TGD now requests that this Court substitute its judgment for that of the state court and Bankruptcy Judge Campbell. This Court should not do so. The 10th Cir. B.A.P. recently affirmed Judge Campbell's decision declining to release the injunction.

*Moving Limited Partners' Post Trial Brief,* p. 32.

Initially, the Court notes that Judge Campbell did not "decline to release the injunction" as the Moving Limited Partners incorrectly assert. Rather, "[Judge Campbell] abstained from ruling on the preliminary injunction ... and left that to be determined by the state court on remand." *Telluride 1,* 364 B.R. 390, 395–96; *see also In re Telluride Income* *Growth L.P. ("Telluride 2"),* 364 B.R. 407, 415–16 (10th Cir. BAP 2007) ("[t]he bankruptcy court abstained from ruling on whether to dissolve the preliminary injunction and related bond."). The difference between declining to release the injunction and abstaining from deciding to release the injunction is significant.

■ Because of the filing of the Debtor's bankruptcy and this Adversary Proceeding, it has been necessary for this Court to address the Moving Limited Partners' third-party beneficiary and equitable lien claims. The Court has determined the Moving Limited Partners have no valid third-party beneficiary claims under the EPA and PMDOT against this Debtor and they do not have an equitable lien on the Ballard House. The Court has jurisdiction to determine these matters because they concern property of the estate, administration of the estate, the allowance of and determination of the validity of claims against the Debtor's estate and proceedings affecting the liquidation of estate assets. *See generally* 28 U.S.C. §§ 1334(e)(1) and 157(A), (B), (K) and (O).

After reviewing the State Court's Preliminary Injunction Order, it appears the order was based primarily on the State Court's finding that there was a reasonable probability that it would impose and foreclose an equitable lien in favor of the Moving Limited Partners. However, now that this Court has made a final adjudication of the matter on its merits and determined the Moving Limited Partners are not entitled to an equitable lien on the Ballard House property, the purpose for and reasons behind the State Court's Preliminary Injunction Order *may* have been satisfied.

Although TGD and TAR request this Court to dissolve the State Court's Preliminary Injunction Order, this Court finds,

similar to Judge Campbell, that the, "matter [is] best left to the state court." *Telluride 1,* 364 B.R. 390, 396–97. This Court's decision to abstain from making a ruling on the dissolution of the State Court Preliminary Injunction Order is based on 28 U.S.C. § 1334(c)(1) (permissive abstention) and on comity with the State Court, as well as the B.A.P.'s conclusion stating, "we do not find any reasons as a matter of law why the bankruptcy court erred when it concluded that the state court was in a better position to determine whether to dismiss the preliminary injunction imposed by the state court...." *Id.* at 398–99. Therefore, the Court declines TGD's and TAR's request to dissolve the State Court injunction.

**E. Whether the Sale of the EPA to TAR was Free and Clear of any Interest, Lien or Claim Asserted by the Moving Limited Partners**

■ TAR requests the Court determine whether it purchased the EPA free and clear of any, right, interest, claim or lien claimed by the Moving Limited Partners. The issue originally arose in TIGLP's involuntary bankruptcy case wherein TAR asserts it purchased all of TIGLP's assets from the Trustee, including all of the Moving Limited Partners' *individual* rights, interests, or claims under the EPA. In the two opinions discussed above, the B.A.P. indicated, *inter alia,* that Judge Campbell had not ruled on the Moving Limited Partners' third-party beneficiary status nor whether the Sale Order was free and clear of the Moving Limited Partners' alleged equitable lien. *See Telluride 1,* 364 B.R. at 394–95 ("[t]he Sale Order does not address nor does it purport to convey to TAR the Limited Partners' personal action to foreclose their alleged equitable lien on the Ballard House project."); *see also Telluride 2,* 364 B.R. at 417–18 ("[t]he bank-

ruptcy court clearly did not intend to rule on the viability of the Limited Partners' asserted third party beneficiary status ... the bankruptcy court stated that it had no intention of ruling or approving the sale of any alleged third party beneficiary nonderivative claims.").

TAR's claim arises from actions taken in TIGLP's bankruptcy case. Based on the B.A.P.'s recent decisions that Judge Campbell did not rule on whether the Sale Order was free and clear of the Moving Limited Partners' alleged equitable lien and nonderivative claims, the Court finds the scope of the Sale Order should be brought before and decided by Judge Campbell in the TIGLP bankruptcy case.

**CONCLUSION**

For the foregoing reasons this Court finds the Moving Limited Partners are not third-party beneficiaries to the EPA and PMDOT. In addition, the Court finds the Moving Limited Partners do not have a right to an equitable lien on the Ballard House property. Because no equitable lien exists, the Court finds TGD's and TAR's claim to avoid the Moving Limited Partners' equitable lien under § 544(b) of the Colorado Uniform Fraudulent Transfer Act to be moot. Also, the Court abstains from dissolving the State Court Preliminary Injunction Order under 28 U.S.C. § 1334(c)(1) based on comity with the State Court and the fact that the State Court is in a better position to dissolve a preliminary injunction order that it originally entered. Finally, because the B.A.P. ruled that Judge Campbell did not address the question of whether the sale order was free and clear of the Moving Limited Partners' asserted claims, this issue should be adjudicated by Judge Campbell. Accordingly, it is

ORDERED that the Moving Limited Partners are not third-party beneficiaries of the EPA and PMDOT.

IT IS FURTHER ORDERED that the Moving Limited Partners do not have any right to an equitable lien on the Ballard House.

IT IS FURTHER ORDERED that the Plaintiff's and Intervenor's fraudulent conveyance claim under 11 U.S.C. § 544(b) of the Colorado Uniform Fraudulent Conveyance Act is DISMISSED as moot.

IT IS FURTHER ORDERED that the Plaintiff's and Intervenor's request for this Court to dissolve the State Court's Preliminary Injunction Order is DENIED.

IT IS FURTHER ORDERED that the Intervenor's request for this Court to determine whether the sale of the EPA to TAR was free and clear of any interest, lien or claim of the Moving Limited Partners is DENIED.